UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MATTHEW WRIGHTMAN,

　　　　　　　　　Plaintiff(s),

　　v.

ARAMARK CAMPUS LLC, et al.,

　　　　　　　　　Defendant(s).

CASE NO. C25-2073-KKE

ORDER ON MOTIONS TO REMAND AND TO DISMISS

This matter comes before the Court on Plaintiff's motion to remand this case to King County Superior Court. Defendants oppose Plaintiff's motion and have filed a motion to dismiss Plaintiff's complaint. Having considered Plaintiff's motion, Defendants' response, Defendants' notice of removal and the declaration attached thereto, the oral argument of counsel, and the remaining record, the Court will deny Plaintiff's motion to remand and grant in part and deny in part Defendants' motion to dismiss.

## I.　BACKGROUND

Plaintiff Matthew Wrightman, a resident of Washington state, has worked for Defendant Aramark Campus LLC in Seattle since December 2023. Dkt. No. 18 ¶ 3.1. In his amended putative class action complaint, Wrightman asserts four causes of action against Aramark Campus LLC, Aramark Services, Inc., and Melinda Altamirano (together, "Defendants"): (1) Defendants failed to pay for work during meal periods, work during rest periods, and overtime hours beyond

ORDER ON MOTIONS TO REMAND AND TO DISMISS - 1

40 per week in violation of the Washington Minimum Wage Act ("MWA") (Dkt. No. 18 ¶¶ 5.1–5.4); (2) Defendants failed to provide rest breaks in violation of the MWA and Washington's Industrial Welfare Act ("IWA") (*id.* ¶¶ 5.5–5.8); (3) Defendants knowingly failed to pay all wages for hours worked, break premiums, and overtime wages (*id.* ¶¶ 5.9–5.13); and (4) Defendants knowingly failed to pay all wages for hours worked, break premiums, attendant overtime wages, and secure scheduling premiums in violation of state law and Seattle's Wage Theft Ordinance ("SWTO") (*id.* ¶¶ 5.14–5.18).

Wrightman alleges that Aramark Services, Inc. "is a foreign for-profit company that employs non-exempt workers to provide foodservice," among other services, and is an employer subject to Washington's wage laws. *Id.* ¶ 3.2. Aramark Campus, LLC, according to the amended complaint, is a limited liability corporation that also employs non-exempt workers and is an employer under Washington's wage laws. *Id.* ¶ 3.3. Finally, Wrightman asserts that Altamirano is "a District Manager for Aramark or its affiliates in Washington, including at the Aramark Campus, LLC" who "had the authority to hire and fire employees, direct the day-to-day work of employees, supervise compliance with wage and hour policies, and/or make decisions regarding the payment of wages." *Id.* ¶ 3.4. Wrightman alleges that Altamirano is also an employer under Washington law. *Id.*

According to the amended complaint, the Class is comprised of "[a]ll individuals employed by Defendants in Washington State as hourly-paid or non-exempt employees at any time from three years prior to the filing of this Complaint to the present." *Id.* ¶ 4.1. Wrightman also brings claims on behalf of a Seattle Subclass, which is comprised of "[a]ll individuals employed by Defendants within the City of Seattle," during the same time period. *Id.* ¶ 4.2.

Wrightman originally filed this putative class action in King County Superior Court on September 8, 2025, bringing claims for meal and rest period violations and related wage violations.

ORDER ON MOTIONS TO REMAND AND TO DISMISS - 2

Dkt. No. 1-1.  On October 22, 2025, Defendants Aramark Campus LLC, Aramark Services Inc., and Melinda Altamirano removed the action to federal court, and subsequently filed a motion to dismiss.  Dkt. Nos. 1, 13.  On November 18, 2025, Wrightman filed his amended complaint.  Dkt. No. 18.  As the amended complaint superseded the original, the Court denied as moot Defendants' motion to dismiss.  Dkt. No. 19.  Wrightman filed a motion to remand the action to King County Superior Court, and Defendants filed a motion to dismiss the amended complaint, both of which have been fully briefed and are ripe for decision.  Dkt. Nos. 20, 21.

## II.   MOTION TO REMAND

### A.    Legal Standard

A defendant may remove to federal court "any civil action brought in a State court of which the district courts of the United States have original jurisdiction[.]"  28 U.S.C. § 1441(a).  In 2005, Congress passed the Class Action Fairness Act ("CAFA"), which gives federal courts jurisdiction over class actions where "there is minimal diversity between the parties (that is, at least one plaintiff is a citizen of a different State from at least one defendant), if the class contains at least 100 members, and … if the amount in controversy exceeds \$5 million."  *Perez v. Rose Hills Co.*, 131 F.4th 804, 807 (9th Cir. 2025) (citing 28 U.S.C. §§ 1332(d), 1453(b)).  Unlike the typical diversity jurisdiction context, "no antiremoval presumption attends cases invoking CAFA, which Congress enacted to facilitate adjudication of certain class actions in federal court."  *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014).  "Congress intended CAFA to be interpreted expansively."  *Ibarra v. Manheim Invs., Inc.*, 775 F.3d 1193, 1197 (9th Cir. 2015) (citing S. Rep. No. 109–14, at 42 (Feb. 28, 2005)).

Nevertheless, the removing party has the burden of establishing federal jurisdiction.  *Abrego Abrego v. Dow Chem. Co.* 443 F.3d 676, 683–85 (9th Cir. 2006).  The removing party may initially meet this burden by filing a notice of removal containing a short and plain statement of

the grounds for removal, 28 U.S.C. § 1446(a), which must include a "plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee*, 574 U.S. at 84, 89. However, when the removing party's "assertion of the amount in controversy is challenged … both sides submit proof and the court decides, by a preponderance of the evidence, whether the amount-in-controversy requirement has been satisfied." *Id.* at 88. To determine the aggregate amount in controversy, the Court may consider allegations in the complaint and "facts presented in the removal petition as well as any 'summary-judgment-type evidence relevant to the amount in controversy at the time of removal.'" *Matheson v. Progressive Specialty Ins. Co.*, 319 F.3d 1089, 1090 (9th Cir. 2003) (quoting *Singer v. State Farm Mut. Auto. Ins. Co.,* 116 F.3d 373, 377 (9th Cir. 1997)).

**B.    The Court Denies Wrightman's Motion to Remand.**

Wrightman challenges Defendants' removal to federal court and argues that "Defendants [e]xaggerate" the amount in controversy in their notice of removal. Dkt. No. 20. at 5. To determine whether removal was proper, the Court must assess whether this case meets CAFA's threshold requirements. The parties agree that the proposed class consists of at least 100 employees, and that there is minimal diversity under CAFA. *Id.* The parties, however, disagree on whether the amount in controversy exceeds $5 million. *Id.*

Although neither Wrightman's amended nor original complaint specify an amount in controversy (*see* Dkt. Nos. 1-1, 18), Defendants' notice of removal asserts the amount in controversy exceeds $5 million. Dkt. Nos. 1, 23. In support of this assertion, Defendants filed the declaration of Roxanne Tucker, an employee who works in the payroll department at "Aramark Management, LLC" in Philadelphia, Pennsylvania. *See* Dkt. No. 1-5 ¶ 1. Tucker avers she "reviewed the available information regarding the non-exempt employees employed" by both "Aramark Services Inc." and "Aramark Campus LLC" in Washington state. *Id.* ¶ 2. Tucker states

that during the relevant period, 3,181 non-exempt employees who are members of the putative class worked a total of 99,416 workweeks and had an average hourly pay rate of approximately $19.28 per hour. *Id*. ¶ 4. She also states that Wrightman worked for approximately 87 workweeks and earned an average hourly pay rate of $31.03. *Id.* ¶ 5. Tucker's declaration forms the basis for Defendants' assumptions regarding each class member's average wage during the relevant period and the number of weeks worked. Defendants further state in their notice of removal that, based upon review of their records, "members of the putative Seattle subclass have worked approximately 9,287 months" during the relevant period. Dkt. No. 1 ¶ 56.

In their notice of removal, Defendants calculated the amount in controversy for the purposes of CAFA jurisdiction to be $13,951,146. Dkt. No. 1 ¶ 62. Defendants arrived at this figure based on the following sums: $1,917,122 for missed, short, or late meal periods (*id.* ¶ 41); $306,739 for Defendants' failure to provide 10-minute rest breaks (*id.* ¶ 46); $1,917,122 for off-the-clock time before and after shifts (*id.* ¶ 49); $1,437,555[1] for overtime claims; $185,746 for failure to reimburse Seattle Subclass Members' employee expenses (*id.* ¶ 56); $776,078 for failure to provide written work schedules to Seattle Subclass Members (*id.* ¶ 60); and attorney's fees equal to 25% of the amount in controversy on the substantive claims (*id.* ¶¶ 62–63). *See also* Dkt. No. 23. Wrightman agrees with Defendants' figure for rest breaks, but argues that all other calculations are predicated on unreasonable assumptions, and thus are overestimates of the amount in controversy. *See* Dkt. No. 20.

---

[1] In their notice of removal, Defendants ascribe a figure of $958,561 to this claim, which appears to have been calculated in error. Dkt. No. 1 ¶ 52. The Court's figure reflects the correct calculation as described both in Defendants' notice of removal and their opposition to Wrightman's motion to remand.

ORDER ON MOTIONS TO REMAND AND TO DISMISS - 5

1. <u>The Court assumes without deciding that the amended complaint controls.</u>

The parties raise a threshold dispute: whether the Court can consider the amended complaint in evaluating the amount in controversy. Wrightman argues that, under *Benko v. Quality Loan Service Corporation*, 789 F.3d 1111, 1117 (9th Cir. 2015), the Court may consider his amended complaint because it "clarif[ies] the claims and nature of his action." Dkt. No. 20 at 5; Dkt. No. 25 at 8–9. In their opposition, Defendants argue that the Court must consider only the original complaint "because post-removal pleadings have no bearing on whether the removal was proper." Dkt. No. 23 at 14 (quoting *Williams v. Costco Wholesale Corp.*, 471 F.3d 975, 976 (9th Cir. 2006)). At oral argument, Defendants suggested that this issue is of no moment, as Wrightman's claims exceed the CAFA jurisdictional threshold when considering either the original or the amended complaint. The Court agrees with Defendants that, even assuming the amended complaint—which eliminates certain claims and does not add any claims—controls, the amount in controversy exceeds $5 million, for the following reasons.

2. <u>Rest Period Claim</u>

As to Wrightman's rest period claim, Defendants assumed the duration of each rest period violation to be 10 minutes (which Defendants converted to 0.16 hours). Dkt. No. 23 at 13. Defendants also assumed, based on the complaint, a violation rate of 20% (one missed rest break violation per five-day workweek). As such, Defendants multiplied the number of workweeks (99,416 weeks) by the average wage ($19.28/hour) by the rest time per week (0.16 hours/week) to reach a figure of $306,749. *Id.* Wrightman does not dispute Defendants' proposed amount in controversy as to his rest period claim. The Court finds these assumptions to be reasonable for the reasons below.

Defendants' assumed violation rate is reasonable given the allegations in the complaint, which provide: "At times, Defendants failed to provide ten-minute rest breaks." Dkt. No. 18 ¶

ORDER ON MOTIONS TO REMAND AND TO DISMISS - 6

4.24.    The Ninth Circuit has provided guidance regarding the reasonableness of assumptions regarding a violation rate: "it makes little sense to require a CAFA defendant to introduce evidence of the violation rate … because the defendant likely believes that the real rate is zero and thus that the evidence does not exist." *Perez*, 131 F.4th at 808.  Instead, "a CAFA defendant can most readily ascertain the violation rate by looking at the plaintiff's complaint." *Id.*  In this Circuit, courts have found a 20% violation rate to be "broadly consistent" with "at times" language used in a complaint, especially where "Defendants have not submitted evidence that would justify a higher rate." *Young v. Lab. Corp. of Am.*, 3 :23-CV-05892-DGE, 2024 WL 689605, at *5 (W.D. Wash. Feb. 20, 2024); *see also Chavez v. Pratt (Robert Mann Packaging), LLC,* No. 19-cv-00719-NC, 2019 WL 1501576, at *3 (N.D. Cal. Apr. 5, 2019) (finding 20% violation rate to be plausible where complaint states that defendant "routinely" failed to provide meal and rest periods); *Mendoza v. Savage Servs. Corp.*, No. 2:19-CV-00122-RGK-MAA, 2019 WL 1260629, at *2 (C.D. Cal. Mar. 19, 2019) (noting that "courts in this district routinely apply a 20% violation rate" for meal and rest period premiums).

Given that Defendants' underlying assumptions regarding the frequency and duration of rest period violations draw on language found in the amended complaint, the amount in controversy for Wrightman's rest period claims is **$306,749**. [2]  Dkt. No. 25 at 10.

  3.   Off-the-Clock Claim

Defendants assume, based on the original complaint, that Wrightman seeks to recover unpaid "off-the-clock" wages.  Dkt. No. 23 at 14–15.  However, Wrightman's amended complaint

---

[2] The Court reaches a different figure when multiplying 99,416 weeks x $19.28/hour x 0.16 hours/week: $306,678.48. However, because the parties do not dispute that the amount in controversy as to rest claims is $306,749, the Court uses Defendants' figure in calculating the total amount in controversy (and, in any case, the discrepancy does not change the outcome here).

omits an off-the-clock claim. Thus, the Court will not consider Defendants' calculation for this claim as part of the amount in controversy.

    4.   <u>Missed, Short, or Late Meal Period Claim</u>

As to meal period claims, Defendants assumed a violation rate of 20%, or one missed, short, or late meal per five-day workweek. Defendants also assumed that each "missed, short, or late meal" (Dkt. No. 18 ¶ 4.12) was 0.5 hours in duration. Defendants therefore multiplied 0.5 hours/week by the average wage ($19.28/hour) and the total number of weeks worked (99,416 weeks). Defendants then performed the same calculation to account for an additional 0.5 hours in "premium pay" per violation, and added that figure to the previous one, effectively doubling the original calculation. *See* Dkt. No. 23 at 12 (citing *Androckitis v. Virginia Mason Med. Ctr.*, 556 P.3d 714, 737 (Wash. Ct. App. 2024)). Adding these sums together, Defendants reached a figure of $1,917,122 for missed, short, or late meal periods.

The Court has previously explained that a violation rate of 20% is appropriate where, as here, a plaintiff uses language such as "at times" to describe the frequency of violations. Wrightman does not argue that a duration of 0.5 hours per meal period claim is inappropriate. As such, the Court turns to whether Defendants' assumptions—that Wrightman's meal period claims seek both compensation for unpaid work and premium pay for violations, and that a 0.5-hour meal period should apply—are reasonable.

Wrightman argues that Defendants' assumption that meal period claims must be compensated with both wages and premium pay is based on a misconstruction of *Androckitis*, and amounts to double-counting possible damages. Dkt. No. 25 at 3–6. In turn, Wrightman asks the Court to find the amount in controversy to be one-half of the figure provided by Defendants: $958,561. Defendants argue that *Androckitis* supports that, for each meal break violation, an employee is always entitled to 30 minutes of unpaid work time and 30 minutes of premium pay.

Dkt. No. 23 at 11–12.  Based on the allegations in the complaint, the Court finds that it is unreasonable for Defendants to assume that each meal period claim warrants both wages and premium pay.

In *Androckitis*, the Washington Court of Appeals held that "the right to have a meal period is a distinct right" from the right to receive compensation for time worked during a meal period, and that an "employer has an 'obligation to pay for the additional … labor it receives when its employees are legally entitled to a rest break.'"  556 P.3d at 729 (quoting *Wingert v. Yellow Freight Sys., Inc.*, 13 P.3d 677, 682 (Wash. Ct. App. 2000)).  In other words, employees are entitled to pay both for the time they spent working during the break, as well as for deprivation of time to rest.

Wrightman correctly notes that his allegations support that some meal break claims do not require compensation for time worked. For instance, Wrightman alleges that "Defendants did not compensate [Wrightman and Class Members] for the *violations*" and "[Wrightman] was not paid additional compensation for these and other meal and rest break *violations*[.]" Dkt. No. 18 ¶¶ 4.12, 4.18 (emphasis added).  Even so, other allegations support that Wrightman seeks compensation for time worked during meal breaks.  For instance, Wrightman alleges that "Defendants failed to pay for all compensable time, including: Work during meal periods," and that "[a]t times when total compensable time, including additional time to compensate for missed … meal periods, totaled over forty [hours] in a workweek, Defendants did not pay one and one-half times the regular rate of pay for all hours." *Id.* ¶¶ 5.3, 4.27.  The amended complaint's reference to meal periods in terms of compensable time suggests that Wrightman seeks compensation for time worked during meal breaks.

Thus, as to meal period claims, neither Defendants' nor Wrightman's calculations are completely reasonable.  "When the district court identifies a different, better assumption concerning the amount in controversy to the one advanced by the removing defendant, the court

'should consider the claim under the better assumption.'" *Young*, 2024 WL 689605, at *5 (quoting *Jauregui v. Roadrunner Transp. Servs., Inc.*, 28 F.4th 989, 996 (9th Cir. 2022)). While Defendants' proposed calculation necessarily overestimates the amount in controversy, Wrightman's calculation underestimates it. Because the amended complaint seeks recovery for missed, short, and late meal periods, the Court will adopt in part each of the parties' proposed calculations. Given Wrightman's framing of its meal period claim as comprising of three types of violations, the Court finds it is reasonable to assume that 1/3 of Wrightman's meal period claims are for "missed" meals that warrant pay for both time worked and premium pay for the violation. Thus, the Court will multiply 0.5 hours/week (time per meal period) by $19.28/hour (the average wage) and the total number of weeks worked (99,416 weeks). This yields a sum of $958,370.24 that represents pay for meal period violations. Multiplying that sum by 1/3 yields an additional $319,456.75 in pay for time worked during one-third of Wrightman's missed meal period claims. The Court adds the pay for time worked during missed meal periods ($319,456.75) to the underlying sum for meal period violations ($958,370.24) to yield a total of **$1,277,826.99** in controversy for Wrightman's meal period claims.

5. Overtime Claim

Defendants assumed that Wrightman sought unpaid overtime wages that are completely distinct from the wages that relate to his meal period or rest break claims. Wrightman asserts that the amended complaint "clarifies that" his "overtime claim is *attendant* to his meal and rest break claims" rather than "a separate stand-alone claim," and asks the Court to zero out the amount placed in controversy by overtime claims. Dkt. No. 25 at 8. The Court is unconvinced that Wrightman's amended complaint omits a separate overtime claim.

Unlike "off-the-clock" claims, the amended complaint makes multiple references to "overtime compensation" sought by Wrightman. *See, e.g.*, Dkt. No. 18 ¶¶ 1.3, 4.27, 5.3, 5.4.

ORDER ON MOTIONS TO REMAND AND TO DISMISS - 10

Despite Wrightman's contention, in only two instances does the amended complaint specify that a particular overtime claim was "attendant" to any other claims. But even in those instances, the word "attendant" does not do as much work to cabin the amount in controversy as Wrightman suggests it does. *See id.* ¶¶ 4.8, 5.16. Neither reference to "attendant overtime" makes clear that the only overtime wages sought are those that stem from missed meal or break periods. Indeed, both references to "attendant overtime" are included within lists that reference claims for "all wages for hours worked," making Defendants' interpretation reasonable. *Id.* Had Wrightman wished to seek only overtime wages related to missed meal or rest periods, he could have said so. Wrightman instead asks the Court to ignore the amended complaint's numerous references to overtime claims, which the Court will not do. Rather, the Court will consider the parties' proposed calculations on the amount placed in controversy by Wrightman's overtime claims.

Here, Defendants assumed a violation rate of 20% (one instance of unpaid overtime per five-day workweek) where each violation accounted for 0.5 hours of unpaid work. Dkt. No. 23 at 16. Defendants multiplied 0.5 hours by the average hourly wage ($19.28/hour) by the number of weeks worked (99,416 weeks) by a 1.5 overtime premium multiplier to reach a figure of $1,437,555. *Id.* Wrightman's only argument as to overtime is that his amended complaint does not include an overtime allegation—he provides no alternative calculation for the Court to consider. Dkt. No. 20 at 7–8, Dkt. No. 25 at 8–9.

Defendants argue that it is reasonable to assume 0.5 hours of overtime per week, citing *Oakley v. Domino's Pizza LLC*, where the court found that five hours of overtime per workweek was a reasonable assumption. Dkt. No. 23 at 16 (citing *Oakley v. Domino's Pizza LLC*, C20-1711 MJP, 2021 WL 509208 (W.D. Wash. Feb. 11, 2021)). As Wrightman offers no alternative, for the purposes of deciding this motion, the Court finds Defendants' estimate of 0.5 hours of overtime per week to be reasonable. *See Gonzalez v. Peak Cal. Rest. Grp., LLC*, 3:25-CV-04068-AMO,

ORDER ON MOTIONS TO REMAND AND TO DISMISS - 11

2025 WL 2934518, at *3 (N.D. Cal. Oct. 15, 2025) (finding assumed one hour of unpaid overtime per week to be "conservative" where plaintiffs alleged defendants "at times" failed to pay overtime); *Oda v. Gucci Am., Inc.*, No. 2:14-CV-07469-SVW (JPRx), 2015 WL 93335, at *4 (C.D. Cal. Jan. 7, 2015) (finding an assumed violation rate of one hour of overtime per week to be reasonable where plaintiffs asserted the defendant "sometimes" failed to pay overtime).

Applying this assumption, the Court calculates the amount placed in controversy by Wrightman's overtime claims to be **$1,437,555.36** (99,416 weeks x $19.28/hour x 0.5 hours/week x 1.5 overtime multiplier = $1,437,555.36).

### 6. Wage Rebate Act Claim

Before considering Wrightman's Wage Rebate Act claim for willful withholding of wages, the Court finds the amount in controversy to be **$3,022,121.35** ($306,739 + $1,277,826.99 + $1,437,555.36 = $3,022,121.35). It is undisputed that Wrightman's claims should be doubled for willfulness under Washington law. *See* Dkt. No. 23 at 17, *see also* Dkt. No. 25 at 10. Doubling the amount in controversy for willful withholding places **$6,044,242.70** at stake before considering the Seattle Subclass Members' claim and attorney's fees.

### 7. Seattle Subclass Scheduling Claims[3]

Wrightman alleges that Defendants unilaterally changed the Seattle Subclass's posted schedules without consent and failed to compensate employees for those changes in violation of Seattle's Secure Scheduling Ordinance, Seattle Municipal Code § 14.22. Dkt. No. 18 ¶¶ 4.28–4.34. Defendants assign an amount in controversy figure of $776,078 to this claim. Dkt. No. 1 ¶¶ 57–59. Defendants posit that, based on review of their records, members of the Seattle Subclass

---

[3] Wrightman does not allege entitlement to personal cell phone use reimbursement in the amended complaint. *See* Dkt. No. 18. As such, the Court will not consider Defendants' amount in controversy as to expense reimbursement, and will instead analyze only Wrightman's scheduling claims. Dkt. No. 23 at 18.

ORDER ON MOTIONS TO REMAND AND TO DISMISS - 12

have worked approximately 9,287 months or 40,245 weeks. *Id*. ¶¶ 56, 59. Defendants further "assume[] one hour of scheduling penalties per workweek." *Id.* ¶ 60. To reach the amount in controversy as to scheduling claims, Defendants multiply the average hourly wage of the class ($19.28/hour) by the number of weeks worked by the Seattle Subclass (40,245 weeks) by the weekly violations (1 hour/week) to reach a sum of $776,078.

Wrightman argues that Defendants' calculation is "unsupported" as they "use an uncited estimate of the number of months worked" and urge the Court to zero-out the Seattle subclass's Secure Scheduling claim as a result. Dkt. No. 20 at 9. In response, Defendants assert that months worked by the Seattle Subclass came from their review of their timekeeping records, as attested to in the Tucker Declaration. Dkt. No. 1 ¶¶ 56, 60. The Ninth Circuit has cautioned against turning "the CAFA removal process into an unrealistic all-or-nothing exercise of guess-the-precise-assumption-the-court-will-pick—even where, as here, the defendant[s] provided substantial evidence and analysis supporting [their] amount in controversy estimate." *Jauregui*, 28 F.4th at 994 (reversing remand to state court). This is "a stage of the litigation before any of the disputes over key facts have been resolved," and Defendants "need not predict the trier of fact's eventual award with one hundred percent accuracy." *Id.* at 993 (quoting *Valdez v. Allstate Ins. Co.*, 372 F.3d 1115, 1117 (9th Cir. 2004)).

Thus, at this stage, the Court finds that the facts provided in the Tucker Declaration and Defendants' Notice of Removal provide sufficient information to support Defendants' analysis, "even though plaintiff has identified information that is not detailed within that declaration." *Serrieh v. Jill Acquisition LLC*, 707 F. Supp. 3d 968, 974 (E.D. Cal. 2023); *see also Jauregui*, 28 F.4th at 994 (cautioning against the "unrealistic" zeroing out a plaintiff's claims in recognition that

"the amount in controversy is supposed to be an estimate of the *entire* potential amount at stake in the litigation"). Thus, the Court will not zero out Wrightman's scheduling violations on this basis.[4]

Wrightman additionally takes issue with Defendants' assumed violation rate of one hour of Secure Scheduling violations per workweek. Dkt. No. 20 at 9. Wrightman asserts his amended complaint "clarifies that [the] violation rate for the Seattle subclass is once per month." *Id.* (citing Dkt. No. 18 ¶¶ 4.27–4.32). The Court disagrees. Although Wrightman alleges instances of violations he experienced on a monthly basis, *see* Dkt. No. 18 ¶¶ 4.29–4.33, as to the overall class, the amended complaint states that "Defendants *often* failed to compensate employees for employer-requested changes to the employee's written work schedule that occurred after the required notice," and that "[t]hese violations are not isolated incidents but part of a *consistent pattern* affecting all non-exempt employees in the same job classifications, demonstrating *common policies and practices* applicable to the proposed class." *Id.* ¶¶ 4.28, 4.35 (emphasis added). Given this language, the Court finds that Defendants' assumed violation rate of one hour per week is reasonable. *See Ibarra*, 775 F.3d at 1198–99 (explaining that a "pattern and practice" of violations "does not necessarily mean *always*" committing violations); *Olson v. Becton, Dickinson & Co.*, 19CV865-MMA (BGS), 2019 WL 4673329, at *3 (S.D. Cal. Sep. 25, 2019) (finding a 25% violation rate to be reasonable where plaintiff alleged the defendant's violations occurred as part of a "pattern and practice"); *Sanchez v. Cap. Contractors Inc.*, C-14-2622 MMC, 2014 WL 4773961, at *3 (N.D. Cal. Sep. 22, 2014) (finding reasonable the defendant's assumption of one hour per work week where violations were described as occurring "regularly"). Where, as here, the complaint makes vague "allegations that permit a range of reasonable inferences, a defendant should not be faulted for making one reasonable inference over another[.]" *Thornhill v. McLane*

---

[4] This finding is not, in any event, dispositive, as the amount at stake including attorney's fees exceeds the CAFA jurisdictional threshold before considering Seattle Subclass claims.

ORDER ON MOTIONS TO REMAND AND TO DISMISS - 14

*Foodservice, Inc.*, 816 F. Supp. 3d 1006, 1015 (N.D. Cal. 2026).  Had Wrightman used more specific language, he "could have constrained the range of assumptions that [Defendants] could reasonably adopt." *Perez*, 131 F.4th at 809–10 (explaining that "an assumption is not unreasonable simply because another equally valid assumption may exist").

In sum, the Court finds Defendants' calculation of the amount at stake with respect to the Seattle Subclass's scheduling claims to be reasonable.  The Court will add **$1,551,847.20** to the amount in controversy ($19.28/hour x 40,245 weeks x 1 hour/week x 2 = $1,551,847.20).[5]  Thus, before accounting for attorney's fees, there is **$7,596,089.90** in controversy.

8.  Attorney's Fees

The Court next considers the amount in controversy as to attorney's fees.  Defendants argue the Court should apply a "percentage-based method, such as 25% of the total amount in controversy." Dkt. No. 1 ¶ 62 (citing *Fritsch v. Swift Transp. Co. of Ariz., LLC*, 899 F.3d 785, 796 n.6 (9th Cir. 2018)).  Wrightman proposes that, as an alternative, the Court should assume this case will require 100 hours of work.  Dkt. No. 20 at 11 (citing *Ott v. Cooper Interconnect, Inc.*, 2:23-CV-04501-SPG-JC, 2023 WL 5530028 (C.D. Cal. Aug. 25, 2023)).

To begin, the Court is not persuaded by Wrightman's argument that this case will require only 100 hours of work.  The cases *Ott* relied upon were each wage-and-hour cases brought on behalf of individual plaintiffs rather than on behalf of a putative class. *See Ott*, 2023 WL 5530028, at *4.  As such, the Court declines to adopt *Ott*'s 100-hour benchmark.

Although Wrightman "is correct that the Ninth Circuit has declined to adopt a per se rule regarding 25% attorneys' fees in class actions, [he] offers no alternative" apart from the 100-hour

---

[5] Although neither party raised doubling of the Seattle Subclass claims, the Court doubles the amount placed in controversy by the claims because the amended complaint unequivocally states that "Plaintiff, [Seattle] Subclass and Class Members are entitled to double damages … under RCW 49.52.070." Dkt. No. 18 ¶ 5.18.

ORDER ON MOTIONS TO REMAND AND TO DISMISS - 15

benchmark the Court has already rejected. *See Sumo v. PSL Assocs., LLC*, 25-5436-BHS, 2025 WL 2624531, at *3 (W.D. Wash. Sep. 11, 2025) (quoting *Arias v. Residence Inn by Marriott*, 936 F.3d 920, 928 (9th Cir. 2019)). Accordingly, because courts in the Ninth Circuit have found an assumed 25% fee award to be reasonable in similar wage-and-hour class actions, the Court will incorporate a 25% attorney's fee award into the amount in controversy. *See, e.g.*, *Lucas v. Michael Kors (USA), Inc.*, No. CV 18-1608-MWF (MRWx), 2018 WL 2146403, at *12 (C.D. Cal. May 9, 2018) (collecting cases). Doing so yields a total amount of **$9,495,112.37** at stake in this action.

In sum, the Court finds Defendants have shown by a preponderance of evidence that the amount in controversy in this case exceeds $5 million. Thus, the Court will deny Wrightman's motion to remand this action to state court. Dkt. No. 20.

### III.  MOTION TO DISMISS

**A.  Legal Standard**

In evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court examines the complaint to determine whether, if the facts alleged are true, plaintiff has stated "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court "consider[s] the allegations collectively and examine[s] the complaint as a whole." *Wilson v. Craver*, 994 F.3d 1085, 1093 n.5 (9th Cir. 2021) (quoting *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014)). A claim is plausible if plaintiff has pleaded "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

**B.      The Court Grants in Part and Denies in Part Defendants' Motion to Dismiss.**

Defendants seek to dismiss all claims against Defendants Aramark Services and Altamirano. Dkt. No. 21 at 3. Defendants additionally seek to dismiss the third and fourth claims of Wrightman's amended complaint as to Defendant Aramark Campus. *Id.* Finally, Defendants ask the Court to dismiss or strike class allegations from the amended complaint because it fails to plausibly assert facts that the requirements of Federal Rule of Civil Procedure 23 can be met as to a putative class of all non-exempt employees in Washington state. *Id.* For the reasons below, the Court grants in part and denies in part Defendants' motion to dismiss.

1.   Wrightman Fails to State a Valid Claim for Relief Against Aramark Services.

Defendants first argue that Wrightman failed to plead any plausible claim against Aramark Services. Dkt. No. 21 at 9–10. As to Aramark Services, Wrightman alleges that it, along with Aramark Campus "are foreign for profit corporate entities that provide food and facilities management services to clients in Washington." Dkt. No. 18 ¶ 1.1. Wrightman additionally alleges that "Aramark Services, Inc. is a foreign for-profit corporation that employs non-exempt workers to provide foodservice, facilities management, and uniform services worldwide" and "is an employer under Washington's wage laws." *Id.* ¶ 3.2. But other than the above definitions, Wrightman included no substantive claims against Aramark Services when amending the complaint.

Defendants first argue that Wrightman merely replaced all previous references to "Defendant" with "Defendants" while adding no new factual allegations, and ultimately defined "Defendants" in the amended complaint in a manner that excludes Aramark Services altogether. Dkt. No. 21 at 9–10 (citing Dkt. No. 18 ¶ 1.2). Wrightman acknowledges the pleading is "imprecise" but claims Defendants are elevating form over substance and asserts that all the allegations pertain to all named Defendants. Dkt. No. 25 at 11. As to the lack of substantive

allegations, in his opposition, Wrightman argues that claims against Aramark Services and Aramark Campus are properly alleged because they are a "single enterprise" or "joint employer." Dkt. No. 25 at 7 (citing *Bonnette v. Calif. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983) and *Ellerman v. Centerpoint Prepress, Inc.*, 22 P.3d 795, 798–99 (Wash. 2001)). In their reply, Defendants counter that Wrightman alleges no facts which suggest a "corporate link" between Aramark Services and Aramark Campus, or any factual allegations of any specific wrongdoing by Aramark Services. Dkt. No. 26 at 7–8. The Court agrees that Wrightman's amended complaint fails to plead facts sufficient to state a claim against Aramark Services.

The Ninth Circuit applies the "economic reality" test to determine whether a defendant qualifies as an employer under the Fair Labor Standards Act ("FLSA"). *Bonnette*, 704 F.2d at 1469–70. Because the Washington MWA is "based on" the FLSA, "Washington courts have applied this test when considering whether a defendant was an 'employer' for the purposes of the MWA." *Young*, 2024 WL 689605 at *6 (citing *Anfinson v. FedEx Ground Package Sys., Inc.*, 244 P.3d 32, 39–40 (Wash. Ct. App. 2010)). In applying the "economic realities" test, courts consider four factors, none of which is dispositive, including whether the employer "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Id.* In determining "whether two affiliated companies should be treated as a 'single employer,'" courts consider four factors: "(1) the degree of interrelation of operations (such as common offices and recordkeeping), (2) whether the companies had common management or directors, (3) whether the companies centralized control of personnel matters and labor relations, and (4) whether the companies were centrally owned and financed." *Radford v. Telekenex, Inc.*, C10-812RAJ, 2011 WL 3563383, at *3 (W.D. Wash. Aug. 15, 2011) (citing *Kang v. U. Lim Am., Inc.,* 296 F.3d 810, 815 (9th Cir. 2002)). "[D]etermination of joint employment" is typically a

"fact-intensive" inquiry. *Becerra v. Expert Janitorial, LLC*, 332 P.3d 415, 419 (Wash. 2014) (quoting *Barfield v. N.Y. City Health & Hosps. Corp.,* 537 F.3d 132, 143–44 (2d Cir. 2008)).

Here, Wrightman alleges only that Aramark Services provides "food and facilities management services to clients in Washington" and "employs non-exempt workers" in Washington state. Dkt. No. 18 ¶¶ 1.1, 3.2. He further alleges that Altamirano is a "District Manager for Aramark or its affiliates in Washington, including at the Aramark Campus, LLC[.]" *Id.* ¶ 3.4. The Court agrees with Defendants that Wrightman's allegations, as written, are too bare bones to support an inference that Aramark Campus and Aramark Services are an integrated enterprise or joint employer. Indeed, Wrightman's amended complaint does not address the joint employer factors at all. Wrightman, for instance, provides no facts which make it plausible that the entities share interrelated operations such as common offices or recordkeeping, that the companies share management, or that the companies centralize control of their personnel matters. *See, e.g.*, *Radford*, 2011 WL 3563383, at *3 (finding parent-subsidiary relationship insufficient to support "two corporations were sufficiently integrated to be considered a single employer"). Though Wrightman need not establish conclusively that Aramark Services is a joint employer with Aramark Campus at this juncture, he "must allege some facts in support of this conclusion." *Laughlin v. Fresenius Med. Care Holdings, Inc.*, 2:23-CV-0180-TOR, 2023 WL 7093801, at *5 (E.D. Wash. Oct. 26, 2023) (granting motion to dismiss claims against alleged joint employer where plaintiff "presented nothing … beyond the status of a parent company" to support the entities were sufficiently integrated to be considered a single employer).

In sum, Wrightman failed to sufficiently plead claims against Aramark Services, and the Court grants Defendants' motion to dismiss the claims against it.

ORDER ON MOTIONS TO REMAND AND TO DISMISS - 19

2.    Wrightman States Valid Claims Against Altamirano.

Wrightman alleges that Altamirano "had authority to pay [him] and Class Members," and that Altamirano "among other things failed to affirmatively promote meal and rest breaks," by, for instance, failing to schedule breaks, failing to schedule enough staff to ensure breaks could be given, and affirmatively failing to relieve Wrightman and Class Members from work. Dkt. No. 18 ¶ 4.19. Wrightman also asserts Altamirano failed to implement systems for reporting missed breaks or to report instances in which workers were not paid for missed breaks, even after Wrightman "complained to his managers about not being provided breaks." *Id.* Wrightman's amended complaint clarifies that Altamirano "had oversight of [his] and Class Members' wages, schedule, and staffing and had the ability to implement reporting, tracking, and compensation of noncompliant meal and rest breaks." *Id.* ¶ 4.20.

Defendants argue that Wrightman has not pleaded sufficient facts to state a plausible claim for individual liability against Altamirano under any theory of liability raised in the amended complaint. The Court considers the sufficiency of Wrightman's complaint as to each claim brought against Altamirano.

a.    *Minimum Wage Act Claim*

As previously explained, Washington courts have found federal authority interpreting provisions of the FLSA "often provides helpful guidance" when interpreting analogous provisions of the MWA. *Drinkwitz v. Alliant Techsystems, Inc.*, 996 P.2d 582, 586 (Wash. 2000). Washington courts therefore apply the "economic realities" test to determine whether a defendant qualifies as an "employer" under the MWA. *Young*, 2024 WL 689605, at *6. "[A]n individual may be considered an employer under the FLSA and personally liable for violations if he or she 'exercises control over the nature and structure of the employment relationship,' or 'economic control over the relationship.'" *Young*, 2024 WL 689605 (quoting *Boucher v. Shaw*, 572 F.3d

1087, 1091 (9th Cir. 2009)).  "When analyzing the economic reality of an employment relationship, courts pay particular attention to whether the [defendant's] duties made him or her 'principally in charge of directing employment practices' such that the employer was 'instrumental in causing the corporation to violate the FLSA.'"  *Solis v. Velocity Express, Inc.*, CV 09-864-MO, 2010 WL 2990293, at *5 (D. Or. July 26, 2010).

Defendants challenge the sufficiency of Wrightman's MWA claim against Altamirano, because, according to them, the "MWA imposes a high threshold to establish individual liability[.]"  Dkt. No. 21 at 15 (citing *Ramirez v. Precision Drywall, Inc.*, No. 65453-5-I, 2011 WL5147660, at *5 (Wash. Ct. App. Oct. 31, 2011)).[6]  They further assert that "non-executive supervisors" such as Altamirano are not employers under the economic realities test "because they lack sufficient control."  Dkt. No. 21 at 14.  Defendants correctly observe that Congress likely did not intend for "low-level supervisors" to be subjected to FLSA liability.  Dkt. No. 21 at 14–15 (citing *Pineda-Marin v. Classic Painting Inc.*, No. CV-08-798-HU, 2010 WL 1257616, at *11 (D. Or. Mar. 25, 2010)).  However, at this juncture, Wrightman has pleaded sufficient facts to make it plausible that Altamirano exercises a greater degree of control than a low-level supervisor: namely, she has hiring/firing authority; she works for the Aramark entity, "or its affiliates in Washington, including at the Aramark Campus, LLC"; she supervises the company's compliance with wage and hour policies; and she makes decisions regarding payment of wages.  *Cf. Arnold v. Marriott Int'l*, No. 2:24-cv-00221-RAJ, 2026 WL 575095, at *2, *6 (W.D. Wash. Mar. 2, 2026) (dismissing MWA claims against an individual defendant who merely "manag[ed] the scheduling and payments" of employees "at a single Marriott location"); *see also Lambert v. Ackerley*, 180 F.3d

---

[6] Defendants' reliance upon *Ramirez* is, at this stage, premature.  There, the Washington Court of Appeals considered the propriety of jury verdicts imposing MWA liability upon individual defendants.  2011 WL 5147660, at *6–7. Although the court found the trial court's definition of "employer" under the *IWA* was erroneous, the court held that the trial court did not err as to the *MWA* claim.  *Id.*  The *Ramirez* court underscored that the "plain language of the [MWA] indicates that individuals … may be employers for the purposes of the MWA."  *Id.*

ORDER ON MOTIONS TO REMAND AND TO DISMISS - 21

997, 1012 (9th Cir. 1999) (affirming district court's FLSA jury instructions, which directed the jury to consider, among other factors, individual defendants' "power to hire and fire employees"; power to "determine salaries"; and "responsibility to maintain employment records" (citation modified)).  Accordingly, and in light of the standard under Rule 12(b)(6), the Court will deny Defendants' motion to dismiss Wrightman's MWA claim against Altamirano.

###### b.    *Wage Rebate Act Claim*

Under the WRA, "[a]ny employer or officer, vice principal or agent of any employer … who … [w]ilfully and with intent to deprive the employee of any part of his or her wages" pays less than what is owed "shall be liable in a civil action by the aggrieved employee[.]"  WASH. REV. CODE §§ 49.52.050, .070.  Defendants argue that the amended complaint does not allege facts to support Altamirano's liability under the WRA: "Plaintiff alleges, in a conclusor[y] (sic) 'fill-in-the-blank' fashion, only that Altamirano 'had the authority to hire and fire employees, direct the day-to-day work of employees, supervise compliance with wage and hour policies, and/or make decisions regarding the payment of wages.'"  Dkt. No. 21 at 11–12.  Defendants argue that Wrightman's allegations against Altamirano mirror the allegations found insufficient in *Muse v. Huntleigh USA Corporation*, No. C16-0357RSL, 2017 WL 1504218, at *1 (W.D. Wash. Mar. 3, 2017)).

The Court disagrees.  In *Muse*, the court granted the defendant's motion to dismiss where the plaintiff "[s]imply identif[ied] someone as a corporate offer," without allegations that those individuals "supervised, controlled, or participated in the decision to deprive plaintiff (or fellow class members) of part of their wages."  2017 WL 1504218, at *1.  Here, in contrast, Wrightman has alleged that Altamirano possessed the authority "to pay Plaintiff and Class Members," but that she nevertheless failed to do so.  Dkt. No. 18 ¶¶ 4.18–4.19.  Wrightman further alleged that when he complained to managers about not being provided breaks, he was told "to focus on completing

ORDER ON MOTIONS TO REMAND AND TO DISMISS - 22

operations and reprimanded." *Id.* ¶ 4.19. Thus, at this stage of the case, Wrightman has sufficiently pleaded a WRA claim against Altamirano.

### c. *Seattle Wage Theft Ordinance Claim*

The SWTO defines an employer as "any individual … person or group of persons … that employs another person and includes any such entity or person acting directly or indirectly in the interest of an employer in relation to an employee." SEATTLE MUN. CODE § 14.20.010. Defendants argue that Altamirano is not an employer for purposes of the SWTO because such a label applies "*only* if certain factors are met." Dkt. No. 21 at 13. As Defendants point out, similar to the MWA, whether an individual is an employer under the SWTO requires application of an economic realities test, which turns on the following factors:

> 1) The nature and degree of control of the workers; 2) The degree of supervision (direct or indirect) of the work; 3) The power to determine the pay rates or the methods of payment of the workers; 4) The right (directly or indirectly) to hire, fire or modify the employment conditions of the workers; 5) Preparation of payroll and the payment of wages.

*Id.* (citing SEATTLE OFFICE OF LABOR STANDARDS, *Wage Theft Ordinance: Questions and Answers*, at 6 (Sep. 27, 2024)). Here, Wrightman pleads that Altamirano had the authority to hire and fire employees, direct employees' day-to-day work, and make decisions regarding the payment of employees' wages. Dkt. No. 18 ¶ 3.4. As with Wrightman's MWA claim, such allegations make Wrightman's SWTO claim against Altamirano at least plausible. Thus, the Court will deny Defendants' motion to dismiss Wrightman's SWTO claim.[7]

### d. *Industrial Welfare Act Claim*

Wrightman's IWA claim stems from Defendants' purported failure to provide breaks and pay premiums, and applies both to the Class and Seattle Subclass. Dkt. No. 18 ¶¶ 5.5–5.8. Under

---

[7] Defendants also argue that "this claim should be dismissed" under *Taber v. Cascade Designs, Inc.*, 706 F. Supp. 3d 1144 (W.D. Wash. 2023). Dkt. No. 21 at 12–13. *Taber* was decided on a motion for summary judgment and thus is inapplicable to the standard under Rule 12(b)(6). *Taber*, 706 F. Supp. 3d at 1152.

ORDER ON MOTIONS TO REMAND AND TO DISMISS - 23

the IWA, an employer is defined as "any person, firm, corporation, partnership, business trust, legal representative, or other business entity which engages in any business, industry, profession, or activity in this state and employs one or more employees[.]"  WASH. REV. CODE § 49.12.005(3)(b).  Here, Wrightman alleges only that Aramark Services and Aramark Campus employ workers in Washington. Dkt. No. 18 ¶¶ 3.2, 3.3.  Wrightman alleges that Altamirano has "authority to hire and fire employees," but nowhere in the amended complaint does he state that Altamirano "employs" any employees.  Although the IWA's definition of "employer" "does not preclude an individual from being held liable for violations of the IWA where that individual engages in business and employs employees[,]" here, "it was the corporate entity,"—Aramark Campus—rather than Altamirano, that "engaged in business and employed one or more employees." *Ramirez*, 2011 WL 5147660, at *4 (citation modified).  Thus, Wrightman fails to plead that Altamirano is an employer under the IWA.  The Court will therefore dismiss this claim with leave to amend. *See Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 701 (9th Cir. 1988) ("Leave to amend should be granted if it appears at all possible that the plaintiff can correct the defect." (quoting 3 MOORE, FEDERAL PRACTICE, § 15.10 at 838 (2d ed. 1948) (citation modified))).

3.   Wrightman States a Valid Claim for Willful Withholding of Wages Under the Washington Wage Rebate Act.

Wrightman's third and fourth causes of action claim entitlement to double damages because Defendants "willfully" withheld employees' wages in violation of the Washington Wage Rebate Act ("WRA"), as well as Seattle's Wage Theft Ordinance. Dkt. No. 18 ¶¶ 5.9–5.18 (citing WASH. REV. CODE §§ 49.52.050, .070).  Defendants argue that Wrightman's assertions regarding willfulness are "conclusory," as he fails to allege "facts establishing Defendants' knowledge." Dkt. No. 21 at 18.

The Washington Supreme Court has held that the test for willfulness is not "stringent." *Schilling v. Radio Holdings, Inc.*, 961 P.2d 371, 375 (Wash. 1998). A claim for "willful" withholding under the WRA requires that "the employer's refusal to pay [] be volitional." *Id.* In other words, "[w]illful means merely that the 'person knows what he is doing, intends to do what he is doing, and is a free agent.'" *Id.* (quoting *Brandt v. Impero*, 463 P.2d 197, 199 (Wash. Ct. App. 1969)). Here, Wrightman alleges sufficiently volitional acts: that Defendants, through direct individual action and company policies, caused Wrightman and putative class members to miss meal and rest breaks, work outside of scheduled shifts, and not to receive compensation for all time worked. Dkt. No. 18 ¶¶ 4.12–4.19, 4.24, 4.28, 4.29–4.35. Contrary to Defendants' assertion that Wrightman pleaded no facts to establish Defendants' knowledge, Wrightman affirmatively alleges that he notified his supervisors about not having been provided required breaks, and that he was reprimanded for doing so. Dkt. No. 18 ¶ 4.19; *see also Arnold*, 2026 WL 575095, at *5 (denying motion to dismiss willful withholding of wages claim where the defendant "through its supervisors, caused [plaintiff] to miss rest breaks and meal breaks," and where it failed to make changes after plaintiff raised the issue to supervisors who worked for defendant). In sum, Wrightman's allegations are more than mere conclusory allegations, and he has sufficiently pleaded a claim for willful withholding of wages under the WRA.

**C.      The Court Denies As Premature Defendants' Motion to Dismiss or Strike Class Allegations.**

The class allegations in Wrightman's amended complaint include a set of "common questions," including: (1) whether Defendants failed to ensure compliant meal and rest breaks; (2) whether Defendants failed to pay wages for all time worked; (3) whether Defendants failed to pay attendant overtime; (4) whether Defendants kept accurate records of hours worked and breaks

ORDER ON MOTIONS TO REMAND AND TO DISMISS - 25

taken; and (5) as to the Seattle Subclass, whether Defendants changed posted schedules without consent in violation of the Seattle Secure Scheduling Ordinance.  Dkt. No. 18 ¶ 4.8.

Defendants move to dismiss pursuant to Rule 12(b)(6), or, in the alternative, strike pursuant to Rule 12(f), the class allegations from the amended complaint.  Dkt. No. 21 at 19–20.  Under Rule 12(f), a court may strike "redundant, immaterial, impertinent, or scandalous matter" from a pleading in order to "avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial."  *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010) (citation modified).

Defendants assert the putative class lacks commonality for two reasons, and thus argue that the class allegations should be dismissed or stricken.  First, Wrightman failed to "allege[] substantive facts that would plausibly indicate how the above questions are 'common' to all non-exempt employees in Washington," Dkt. No. 21 at 20.  Second, in Defendants' view, Altamirano's role as a "District Manager" implies that she oversees a limited subset of Aramark Campus employees across the state of Washington, further undermining Rule 23's commonality requirement.  *Id.* (citing Dkt. No. 18 ¶ 3.4).

In general, "compliance with Rule 23 is not to be tested by a motion to dismiss for failure to state a claim[.]"  *Gillibeau v. City of Richmond*, 417 F.2d 426, 432 (9th Cir. 1969); *see also Mish v. TForce Freight, Inc.*, No. 21-cv-04094-EMC, 2021 WL 4592124, at *8 (N.D. Cal. Oct. 6, 2021) (explaining that dismissal of class claims on a Rule 12(b)(6) motion may be appropriate "where the complaint lacks *any* factual allegations and reasonable inferences that establish the plausibility of class allegations" (emphasis in original)).  Rule 12(f) motions are also generally disfavored, especially as to class allegations, "because the shape and form of a class action evolves only through the process of discovery."  *Adan v. Swedish Health Servs.*, No. 2:23-cv-01266-TL,

2024 WL 2398208, at *4 (W.D. Wash. May 23, 2024) (quoting *Hoffman v. Hearing Help Express, Inc.*, No. C19-5960, 2020 WL 4729176, at *2 (W.D. Wash. Mar. 27, 2020)).

Though Defendants cite two out-of-district cases dismissing class allegations at the motion to dismiss stage, they "[have] not shown the Court that this case is such an exception" to the general rule, or that it "would not benefit from discovery." *Jensen v. Capital One Fin. Corp.*, C24-0727-KKE, 2025 WL 606194, at *7 (W.D. Wash. Feb. 25, 2025) (citing *Patrick v. Ramsey*, No. C23-0630-JLR, 2023 WL 6680913, at *2 (W.D. Wash. Oct. 12, 2023) (denying motion to strike class allegations as premature where it could not "conclude that the class [was] uncertifiable as a matter of law")); *Johnson v. Metro-Goldwyn-Mayer Studios Inc.*, No. C17-541 RSM, 2017 WL 3313963, at *7 (W.D. Wash. Aug. 3, 2017) (collecting cases and observing that "most courts decline to strike class allegations prior to class certification motions and discovery"). The Court therefore declines to find, at this time, that the class is uncertifiable as a matter of law and denies as premature Defendants' motion to dismiss, or in the alternative, to strike.

**D.    Leave to Amend**

The Court will grant Wrightman leave to amend. "[D]ismissal without leave to amend is improper unless it is clear … that the complaint could not be saved by any amendment." *United States v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011). Here, the Court finds Wrightman may allege additional facts consistent with this order to clarify the nature of his claims against Aramark Services and his IWA claim against Altamirano.

## IV.    CONCLUSION

Wrightman's motion to remand (Dkt. No. 20) this case to the King County Superior Court is DENIED. Defendants' motion to dismiss (Dkt. No. 21) is GRANTED IN PART as to Wrightman's IWA claim against Altamirano and Wrightman's claims against Aramark Services, Inc., but is otherwise DENIED. If Wrightman elects to amend his complaint with respect to his

IWA claim against Altamirano and claims against Aramark Services, Inc., he must do so no later than August 3, 2026.

Dated this 17th day of July, 2026.

Kymberly K. Evanson
United States District Judge